AMERICAN UNION LINE, INC., Respondent, *v.* ORIENTAL NAVIGATION CORPORATION, Appellant.

First Department, January 13, 1922.

Trial — opening and closing — right to open and close is with defendant where affirmative defenses and counterclaims only interposed — verdict — verdict should not be directed till both sides have rested — when plaintiff may be assumed to have rested — contracts — action to recover deposit made on contract for purchase of vessel — purchaser relieved if performance made impossible by act of government — conditional refusal of government to permit transfer does not establish impossibility — clause in contract not available where plaintiff misrepresented that it was American corporation.

The defendant has the right to open and close where the cause of action set out in the complaint is not denied in the answer but affirmative defenses and counterclaims only are interposed by the defendant.

While the practice is that a verdict may not be directed until all the parties have rested, it may be assumed that the plaintiff had rested where after the defendant had introduced its evidence and rested, the plaintiff moved for a directed verdict.

The complaint in an action to recover a deposit made on the purchase price of a vessel sold under a contract which provided that the sum deposited should be repaid if the contract should become impossible of performance by reason of any restraints or acts of the government, does not state a cause of action, where it is alleged that the capital stock of the plaintiff was held by a foreign corporation and that the United States Shipping Board, after an investigation, declined to consent to the transfer of the vessel to the plaintiff " unless and until the said United States Shipping Board should be satisfied that the said Shapiro, an American citizen, [the alleged owner of the plaintiff], had obtained the controlling interest in said capital stock."

It was incumbent on the plaintiff to allege and prove that its failure to perform its contract was due to one or more of the causes mentioned therein which would relieve it from liability, and that it was beyond its control or power to do anything which would entitle it to purchase the vessel in question.

The provisional restraint on the part of the government did not show that it was impossible for the plaintiff to perform, as it was within its power to remove the cause for the restraint by the principal owner of the plaintiff settling his differences with said foreign corporation and acquiring the stock of the plaintiff.

It was not the duty of the defendant to obtain the consent of the United States Shipping Board to the transfer.

Furthermore, the misrepresentations of the plaintiff, as to the ownership of its stock being in American citizens and as to the plaintiff being under the control of American citizens before the contract was executed, presented a question for the jury upon the question of fraud in respect of defendant's counterclaim for damages and of plaintiff's right to cancel the contract.

The plaintiff cannot escape its responsibilities of performing the contract on the plea that it was unable to perform owing to the restraint of the government if it induced the defendant by misrepresentations to enter into the contract, which were made with a full understanding that the government would not give its consent to an alien ownership of the vessel.

APPEAL by the defendant, Oriental Navigation Corporation, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 21st day of February, 1921, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the same day denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*Duncan & Mount* [*Herman S. Hertwig* of counsel; *Russell T. Mount* with him on the brief], for the appellant.

*Butler, Wyckoff & Campbell* [*Frederick B. Campbell* of counsel; *William H. Fain* with him on the brief], for the respondent.

GREENBAUM, J.:

The complaint, after stating that the plaintiff and defendant are corporations respectively organized under the laws of the State of New York, alleges that on or about the 20th day of February, 1918, in the city of New York they entered into a written agreement whereby the defendant agreed to sell and the plaintiff to purchase the steamer *Fair Oaks* for the sum of $185,000, of which $50,000 was paid upon its execution. The agreement recites that the vessel was then committed to three voyages to West Indian and Gulf ports and that upon the completion of these voyages and its return to the port of New York, the balance of the purchase price of $135,000 was to be paid prior to its leaving that port, but not later than

thirty days after her arrival. A preamble in the agreement reads as follows: " Whereas the United States Shipping Board . has consented to the transfer of the said steamer to the American Union Line, Inc., as shown by the Shipping Board's letter of February 7th, 1918." The agreement also contains the following provision:

" Clause 7. Neither party to this contract shall become liable to the other in any manner whatsoever for failure to perform this contract, owing to perils of the seas or of navigation, arrests, restraints or acts of princes, rulers, governments or people, or owing to any other cause beyond the control of any such party. Provided, however, that in the event that this contract shall be or become impossible of performance owing to the causes hereinabove mentioned or any of them, the sums paid to the vendor by the purchaser shall be forthwith repaid to the purchaser by the vendor without interest."

The complaint also alleges the arrival of the steamship in the port of New York on August 12, 1918; that plaintiff tendered the balance of $135,000 on September sixth, to the defendant, which refused delivery of the steamship to the defendant " except upon the condition that the plaintiff shall furnish the defendant satisfactory evidence of the War Trade Board's consent to such transfer and delivery and on September 11th, 1918, the defendant, through its attorneys " tendered to the plaintiff the necessary documents to accomplish the transfer of the vessel to plaintiff upon payment of the balance of the purchase price and evidence of the War Trade Board's consent to the plaintiff's taking title to the vessel; that " at the time provided by the said agreement for the delivery of the steamship *Fair Oaks* and for some months prior thereto, the entire capital stock of the plaintiff was in the custody and under the control of the Interchange, Ltd., a corporation created and existing under the laws of the Kingdom of Denmark; " that on September 7, 1916, Congress duly passed an act known as the " Shipping Act," which thereafter and on the 15th day of July, 1918, was so amended that it provided among other things, " that when the United States was at war, it should be unlawful, without first obtaining the approval of the United States Shipping Board, to sell, mortgage, lease, charter, deliver or in any manner transfer to any person not a citizen

of the United States, any vessel documented under the laws of the United States, or any interest therein." The " ninth " paragraph of the complaint alleges that " prior to the time provided for the delivery of the steamship *Fair Oaks*, the United States Shipping Board examined the books of the plaintiff corporation, and a certain contract made on or about the 20th day of June, 1917, between the said Interchange, Ltd., and Isaac Shapiro of New York City, concerning the ownership, custody and control of the capital stock of the plaintiff corporation and after such examination declined to consent to the transfer and delivery of the said steamship *Fair Oaks* from the defendant to the plaintiff unless and until the said United States Shipping Board should be satisfied that the said Shapiro, an American citizen, had obtained the controlling interest in said capital stock."

The complaint concludes with allegations of defendant's refusal to transfer to the plaintiff the steamship *Fair Oaks* and of its failure to repay to plaintiff the sum of $50,000 paid to defendant " on account of the purchase price of said steamship or any part thereof." Judgment was demanded for the aforementioned $50,000. Defendant made no denials in its answer to the allegations of the complaint but set up six affirmative defenses and two counterclaims. The first affirmative defense alleges the " Trading with the Enemy Act," " Shipping Act " and the " Espionage Act " enacted by Congress* which provided, among other things, that no vessel should be bought or sold without the prior approval of the " War Trade Board " or " Shipping Board; " that at the time of the making of the contract, the defendant was ignorant of the situation in regard to the ownership and control of the plaintiff's capital stock, and made its contract with " the plaintiff in the belief that the plaintiff was a *bona fide* American corporation under the war legislation of Congress, and in reliance upon the plaintiff's representations to that effect; " that defendant did not enter into a contract with the plaintiff as alleged in the complaint until it had written to the Shipping Board to learn if the Shipping Board would consent thereto and that

---

* See 40 U. S. Stat. at Large, 411, chap. 106; 39 id. 728, chap. 451; 40 id. 217, chap. 30, as respectively amd.— [REP.

it obtained the Shipping Board's consent by stating to the Shipping Board, in accordance with the plaintiff's representations, to it, that the plaintiff was an American corporation, and the said consent of the Shipping Board is recited in the premable of the contract itself.

It further avers that the plaintiff did not make known to the defendant prior to the making of the contract the existence of any complications in regard to its capital stock and that when some time after the contract was made, the War Trade Board and Shipping Board informed the defendant that there was some difficulty in regard to the plaintiff's capital stock, and that these Boards would not allow the plaintiff to take title to the vessel until they were satisfied that the stock, ownership and control had become vested in *bona fide* American interests, the defendant requested the plaintiff and its treasurer, Isaac Shapiro, to satisfy the Boards in regard to the said matters, and that they wrongfully neglected and refused to do so.

The second affirmative defense alleges that the relations between the plaintiff and the Interchange, Ltd., a Danish corporation, referred to in the complaint, arose out of an agreement in which it was provided that the entire capital stock of the plaintiff should be transferred to Shapiro upon payment to the Interchange, Ltd., of the amount due from the plaintiff to the said Interchange, Ltd.; that this amount was to be found and determined prior to June 23, 1917, and that pending this settlement the capital stock should be held in escrow by one Joseph G. Engel, and that the affairs of the plaintiff corporation should be conducted under the supervision and control of Shapiro, subject only to its board of directors.

It is further alleged in said defense that Shapiro had control of the plaintiff, and that it was in the power of plaintiff and Shapiro to conclude its settlement of the account with the Interchange, Ltd., and that they failed to satisfy the requirements of the War Trade Board and Shipping Board and demanded that the defendant transfer the vessel to the plaintiff in disregard of the prohibition of the said Boards.

The third defense alleges that at the expiration of the time fixed in the contract for the performance thereof, namely, September 11, 1918, defendant by reason of the plaintiff's

default, exercised its option to cancel the contract and applied the $50,000 theretofore received on account of the purchase to its damages resulting from plaintiff's breach thereof.

In its fourth affirmative defense it alleges damages sustained by the defendant at $75,000.

In the fifth affirmative defense it sets up the representations of the plaintiff at the time of the making of the contract as to its being an American corporation upon which it relied and the falsity of such representations.

The sixth affirmative defense is based upon the prematurity of the action.

The first counterclaim alleges the failure on the part of the plaintiff to perform the contract on its part to defendant's damage in the sum of $75,000.

The second counterclaim sets up the alleged misrepresentations of the plaintiff in regard to its being a *bona fide* American corporation and the defendant's reliance thereon and damage resulting to the defendant in the sum of $75,000.

Upon the state of the pleadings the right to open and close was with the defendant. Defendant moved to dismiss the complaint upon various grounds among others that " the complaint does not show that the performance by the plaintiff of its obligation to purchase a vessel was impossible; it shows only a conditional veto by the Government of the plaintiff's right to purchase and just what the condition of the plaintiff's stock was that gave rise to the veto, the complaint does not show. It does not show what the plaintiff would have had to do to get the stock out of alien control or that it was in any way impossible for the plaintiff to do that." The motion was denied, and defendant duly excepted.

Defendant thereupon submitted its evidence, whereby it established, without any contradiction thereof on the part of the plaintiff, that Mr. Shapiro stated during the course of the negotiations for the sale of the vessel that he was an American citizen and that the plaintiff, the American Union Line, was an American corporation, entitled to own American ships and that he owned the American Union Line.

It was also shown that the defendant, acting under the belief that the representations made by Shapiro as to his citizenship and plaintiff's right to purchase an American

vessel, communicated with the Shipping Board for the purpose of ascertaining whether it would consent to the transfer of the *Fair Oaks* to the plaintiff and that on or about the seventh of February the Shipping Board replied that "the Board has given its consent to the purchase of this vessel by the American Union Line, Inc., of New York;" that by reason of this consent the contract between the parties recited the preamble to that effect. The Shipping Act of 1916 then in force provided as follows: "When the United States is at war, * * * no vessel registered or enrolled and licensed under the laws of the United States shall, without the approval of the board, be sold, leased, or chartered to any person not a citizen of the United States" (39 U. S. Stat. at Large, 730, 731, § 9),* and it further provided that "The term ' person' includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, or of any foreign country." (39 U. S. Stat. at Large, 728, 729, § 1.) It also provided: "That within the meaning of this Act no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president and managing directors are citizens of the United States and the corporation itself is organized under the laws of the United States or of a State, Territory, District, or possession thereof." (39 U. S. Stat. at Large, 729, § 2.)*

It was shown upon the trial that defendant had no knowledge of the state of the ownership of the plaintiff's stock or of the names and citizenship of its directors and officers; that it was not until some time in May or June, 1918, that the defendant first had any intimation from the War Trade Board that there was some question or defect about the stock control of the plaintiff; that thereafter defendant caused this matter to be brought to the attention of the plaintiff; that Mr. Shapiro " poo-poohed the trouble with the War Trade Board "

---

* Since amd. by 40 U. S. Stat. at Large, 900, chap. 152; 40 id. 901, § 4, adding to 39 id. 738, § 37 et seq. See, also, Merchant Marine Act, 1920 (41 U. S. Stat. at Large, 1008), § 38, amdg. Shipping Act, 1916, § 2; Merchant Marine Act, 1920 (41 U. S. Stat. at Large, 994, 995), § 18, amdg. Shipping Act, 1916, § 9.— [REP.

and said " there was nothing to it, that he was the owner of the stock and that the War Trade Board had no right to say otherwise." It also appears that on a subsequent occasion this subject was again discussed and Shapiro stated, " that he had brought a suit in a Brooklyn court " (referring to a United States court sitting in Brooklyn) against the Interchange, Ltd.; that in answer to the suggestion of one of the officers of the defendant corporation that Shapiro " go down to Washington and try to clear this thing up," he said that " he would not do anything of the sort; that he had brought suit in Brooklyn and that is all he was going to do; that the stock was his and he was not going to bother himself any more about it." It also appears from the testimony of the defendant that thereafter it repeatedly urged the plaintiff to get in touch with the War Trade Board and to satisfy it of the truth of his (Shapiro's) statement so that the impediment in the performance of the contract might be removed. In this connection it is important to bear in mind the allegations in the " ninth " paragraph of the complaint which has heretofore been quoted and particularly that portion thereof which alleges that after the examination by the Shipping Board of plaintiff's books it " declined to consent to the transfer and delivery of the said steamship *Fair Oaks* from the defendant to the plaintiff *unless and until the said United States Shipping Board should be satisfied that the said Shapiro, an American citizen, had obtained the controlling interest in said capital stock.*" (Italics ours.)

It is thus an unquestioned fact upon the state of the proofs that the Shipping Board's refusal to consent was not an absolute or final one, but on the contrary that it was merely tentative and that consent would be given upon proof that Shapiro, an American citizen, owned a controlling interest in the capital stock of the plaintiff. Defendant introduced in evidence the contract of June 20, 1917, between the Interchange, Ltd., and Shapiro which recites that the Interchange, Ltd., owned the entire capital stock of the plaintiff and also that it had advanced moneys to the plaintiff. The contract also provided for an adjustment of the accounts between the Interchange, Ltd., and the plaintiff. Under that agreement all of the capital stock of the plaintiff was placed in escrow

with one Joseph G. Engel, an attorney, to be turned over to Shapiro on settlement of the account between them which was to be completed "prior to the 23rd of June, 1917."

The proofs were that the accounts were not settled prior to June 23, 1917, nor in September, 1917, when the vessel was ready for delivery. Defendant also submitted testimony on the question of its claim for damages to the effect that the price of steamships at the time when the defendant was ready to deliver the *Fair Oaks* to plaintiff had depreciated on account of the large number of wooden ships which had then been constructed by government agencies.

After the defendant had rested, the plaintiff moved to dismiss the counterclaim and to direct payment for the plaintiff. Defendant thereupon inquired whether plaintiff had rested and contended that a motion to direct a verdict was not proper until after both parties had rested. The court over-ruled defendant's contention and held that the defendant having put in its evidence, a motion to direct a verdict was proper. The court thereupon dismissed the counterclaim and granted the motion for a direction. The practice is that a verdict may not be directed until all the parties have rested. It may, however, be assumed that plaintiff had rested under the circumstances here appearing. Defendant moved for the direction of a verdict on its counterclaim, which was denied. Defendant moved to dismiss the complaint and for a nonsuit, which was also denied. Defendant then requested to go to the jury upon the "question of whether or not it was possible for the plaintiff in this case to comply with its obligation to purchase the vessel," and also "to submit to the jury the question whether or not there was fraud and misrepresentation on the part of the plaintiff inducing the contract and the amount of damages suffered by the defendant in consequence of that fraud and misrepresentation." These motions were denied.

It is evident from the disposition of the case made by the learned trial justice and from his rulings in excluding testimony proffered in behalf of the defendant that he was of opinion that the mere refusal of the Shipping Board to consent to the transfer of the vessel to the plaintiff was in itself conclusive proof that it was impossible for the plaintiff to perform its contract, entitling it to a cancellation thereof and to repayment

of the $50,000 which had been paid to defendant on account of the purchase price. The instances where the defendant was not permitted to introduce testimony were numerous. It will suffice to mention a number of them as illustrative of the court's rulings. The defendant was not permitted to show by the testimony of one of the members of the War Trade Board what efforts, if any, were made by the plaintiff to obtain its consent or what occurred before the Board in the matter of seeking its consent. The court excluded a letter sent by plaintiff's attorney dated September 11, 1918, to defendant's attorneys, in which the plaintiff took the position that the defendant was obliged to tender the vessel to the plaintiff " regardless of the consent or non-consent of the War Trade Board Intelligence Bureau," notwithstanding that under the Federal laws it would subject the defendant to criminal action to make a sale of the vessel without the governmental consent. Defendant was not permitted to show the state of the accounts between the Interchange, Ltd., and the plaintiff and what efforts had been made by the latter to procure settlement of the accounts nor to prove that the plaintiff's president and managing directors were not American citizens. The court excluded a letter from the War Trade Board under date of May 25, 1918, written to the defendant's attorney, and also letters from the plaintiff to the War Trade Board and from the War Trade Board to it. This was important not only to show the circumstances or conditions under which the War Trade Board acted, but also for the purpose of showing the insincerity of the plaintiff's conduct in view of the fact that on August thirteenth it had written to defendant " to remind you that we have no means of knowing or no reason to know whether the War Trade Board will permit you to transfer this vessel to us or not. The burden of determining whether you can obtain the consent of the War Trade Board to this sale rests solely upon you under our contract and we must insist upon your bearing it."

The court refused to permit in evidence a letter written in behalf of the plaintiff to the War Trade Board on August twelfth, in which it requested a favorable decision, to which the War Trade Board on the same day in August replied that " in view of the fact that no further evidence has been pre-

sented to us respecting the ownership of the stock of the American Union Line our position in the matter remains unchanged and we are unwilling at the present time to approve of the transfer of the *Fair Oaks* to the American Union Line."

The defendant offered in evidence the pleadings in the action brought by plaintiff and Shapiro against the Interchange, Ltd., arising from the latter's alleged failure to perform its contract of June 20, 1917, and also the decision and judgment of the court in that action, but the court ruled out such evidence. The defendant was thus prevented from showing what the dispute between the plaintiff and the Interchange, Ltd., was as bearing upon the question whether it was possible for plaintiff to compose those differences and thus obtain governmental consent to the purchase.

All the facts testified to in behalf of the defendant as well as those alleged in the plaintiff's complaint being uncontradicted, we must assume that the contract between the parties was entered into, so far as defendant was concerned, in reliance upon the truth of the representations made by Shapiro, acting for the plaintiff, that the latter was an American corporation in a position to purchase the vessel in question and that Shapiro was an American citizen and the owner of the capital stock of the plaintiff corporation.

Regardless of the alleged misrepresentations of the plaintiff, it seems clear that to entitle the plaintiff to recover it was incumbent upon it to allege and establish that its failure to perform the contract was due to one or more of the causes mentioned in paragraph " 7 " of the contract between the parties and that it was " beyond its control " or power to do anything which would entitle plaintiff to purchase the vessel in question. In other words, that it was an " impossibility " on the part of the plaintiff to perform " owing to the causes * * * or any of them " mentioned in the contract.

If plaintiff could have settled its controversy with the Interchange, Ltd., even at a loss to itself, the alleged " impossibility " to perform would have vanished.

As bearing upon the question of the possibility of Shapiro's acquiring control of the stock of the plaintiff corporation, the plaintiff offered in evidence the decision and judgment in the action brought by plaintiff and Shapiro against the Inter-

change, Ltd., which the court excluded. An examination of the decree which was marked " G.G." for identification, and which is embodied in the case on appeal, shows that upon payment to the Interchange, Ltd., or its attorneys, of $1,702.66, less $650.50, taxable costs, by Isaac Shapiro or the American Union Line, Inc., the defendant, Joseph G. Engel, was authorized to deliver to Shapiro all of the capital stock of the American Union Line, Inc. The amount required to be paid by Shapiro was a comparatively small sum, and would be some evidence which the jury rightfully might consider upon the question of whether there was a possibility of performance on the part of plaintiff

Plaintiff's contention that it was defendant's duty to obtain the consent is preposterous. What could defendant have done to secure the government's approval of the transfer? Plaintiff itself allowed a condition to continue which prevented the plaintiff from being put under the control of American citizens and the duty devolved upon Shapiro and plaintiff to resort to every possible lawful means to bring the plaintiff corporation under such control.

A provisional restraint on the part of the government does not establish that it was impossible for plaintiff to comply with the government's conditions. Shapiro might have settled his differences with the Interchange, Ltd., by paying a sum, even if exorbitant, which would have made it possible to obtain the stock of the plaintiff corporation and to perform its contract. The right to cancellation rests upon " impossibility " to perform and not upon hardship upon the plaintiff.

In our opinion the complaint should have been dismissed because it omits to set forth what was done, if anything, towards obtaining American control or ownership of plaintiff's stock or to allege any facts from which it would appear that it was beyond its power to secure such control or ownership.

But in addition to what we have said, the misrepresentations of the plaintiff as to Shapiro's ownership of plaintiff's stock and as to plaintiff being under the control of American citizens before the contract was executed would require the submission of the case to the jury upon the question of fraud in respect of defendant's counterclaim for damages and of plaintiff's right to cancel the contract. Good conscience will

not permit the plaintiff, to the damage of the defendant, to escape the responsibilities of performing its contract, on the plea that it was unable to perform its contract owing to the restraint of the government when it induced the defendant by misrepresentations to enter into the making of the contract, which were made with a full understanding that the government would not give its consent to an alien ownership of the vessel.

It follows that the judgment and order appealed from should be reversed and a new trial ordered, with costs and disbursements to appellant to abide the event.

CLARKE, P. J., SMITH, PAGE and MERRELL, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.